(Slip Opinion)

# Requests by Individual Members of Congress for Executive Branch Information

In reviewing requests from Congress, the Executive Branch's longstanding policy has been to engage in the established process for working to accommodate congressional requests for information only when those requests come from a committee, subcommittee, or chairman acting pursuant to oversight authority delegated from a House of Congress. Departments and agencies, however, may appropriately give due weight and sympathetic consideration to requests for information from individual members of Congress not delegated such authority.

Only a committee chairman may request presidential records under section 2205(2)(C) of the Presidential Records Act, unless the committee has specifically delegated that authority to another member.

February 13, 2019

MEMORANDUM OPINION FOR THE FILES

This memorandum expands upon a letter opinion for the Counsel to the President issued on May 1, 2017, in which we addressed certain questions concerning the authority of individual members of Congress to exercise Congress's oversight authority. *Authority of Individual Members of Congress to Conduct Oversight of the Executive Branch*, 41 Op. O.L.C. __ (2017) ("*Oversight by Individual Members*"). This memorandum also memorializes more recent, informal advice provided to the General Counsel of the National Archives and Records Administration ("NARA") concerning the authority of individual members to request presidential records under the Presidential Records Act ("PRA").

In *Oversight by Individual Members*, we concluded that "the constitutional authority to conduct oversight—that is, the authority to make official inquiries into and to conduct investigations of Executive Branch programs and activities—may be exercised only by each House of Congress or, under a delegation, by committees and subcommittees (or their chairmen)." *Id.* at *1. "Individual members of Congress, including ranking minority members," we stated, "do not have the authority to conduct oversight in the absence of a specific delegation by a full house, committee, or subcommittee." *Id.*

*Oversight by Individual Members* "briefly explained" our views concerning requests for information from individual members of Congress.

*Id.* The Supreme Court has defined the congressional oversight authority to consist of the inherent power of each House to "gather information in aid of its legislative function" by means of compulsion, if necessary. *Id.* Each House has the authority to delegate that function under its own rules and procedures. Typically, however, Congress has not delegated such authority to individual members of Congress who are not committee chairmen. Although requests for information from individual members of Congress do not constitute exercises of Congress's oversight authority, that does not mean that an individual member's request should be treated the same as a Freedom of Information Act request or a request from a member of the general public. As a matter of comity, the Executive Branch's appropriate respect for the legislative functions of individual members supports Executive Branch officials' practice of giving due weight and sympathetic consideration to those requests.

We recently addressed a related question in connection with the Senate Judiciary Committee's request for presidential records relevant to the nomination of then-Judge Brett Kavanaugh to the Supreme Court. In July 2018, the Chairman of the Judiciary Committee requested from NARA special access to a substantial volume of records concerning Kavanaugh's service in the Office of the White House Counsel during the George W. Bush Administration. Following that request, the Ranking Member of the Committee requested additional records—those relating to Kavanaugh's subsequent work as Staff Secretary—that the Chairman had specifically declined to request. The PRA provides that a committee of Congress may request nonpublic records when needed for the conduct of its business. 44 U.S.C. § 2205(2)(C). Consistent with NARA's past administration of this statute, as well as our interpretation of a similar provision under the Privacy Act, we informally advised NARA that only a committee chairman may request presidential records under section 2205(2)(C), unless the committee has specifically delegated that authority to another member.

## I.

The Constitution vests "[a]ll legislative Powers" in "a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. art. I, § 1. The Supreme Court has recognized that one of those legislative powers is the implicit authority of each House of Congress to gather information in aid of its legislative function. *See*

*McGrain v. Daugherty*, 273 U.S. 135, 174 (1927). As the Court has explained, "[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it." *Id.* at 175. Because "mere requests for such information often are unavailing, and . . . information which is volunteered is not always accurate or complete," though, "some means of compulsion are essential to obtain what [information] is needed." *Id.*; *see also Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975) ("[I]ssuance of subpoenas . . . has long been held to be a legitimate use by Congress of its power to investigate."); *Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act*, 10 Op. O.L.C. 68, 81–82 (1986) ("*Response to Congressional Requests*"). For purposes of this memorandum, we refer to each House's formal "power of inquiry . . . with process to enforce it," *McGrain*, 273 U.S. at 174, as that House's "oversight" authority.

Each house may exercise its oversight authority directly—for example, by passing a resolution of inquiry seeking information from the Executive Branch. *See* 4 Lewis Deschler, *Deschler's Precedents of the United States House of Representatives* ch. 15, § 2, at 2304–23 (1994) (describing the practice of resolutions of inquiry and providing examples); Floyd M. Riddick & Alan S. Frumin, *Riddick's Senate Procedure* 882 (1992) ("The Senate itself could investigate or hear witnesses as it has on rare occasions[.]"). In modern practice, however, each House typically employs its oversight authority "through delegations of authority to its committees, which act either through requests by the committee chairman, speaking on behalf of the committee, or through some other action by the committee itself." *Application of Privacy Act Congressional-Disclosure Exception to Disclosures to Ranking Minority Members*, 25 Op. O.L.C. 289, 289 (2001) ("*Application of Privacy Act*"); *see also* Alissa Dolan et al., Cong. Research Serv., *Congressional Oversight Manual* 65 (Dec. 19, 2014). "The theory of a committee inquiry is that the committee members are serving as the representatives of the parent assembly in collecting information for a legislative purpose" and, in such circumstances, "committees and subcommittees, sometimes one Congressman," are authorized to

exercise the parent assembly's authority. *Watkins v. United States*, 354 U.S. 178, 200–01 (1957).

The Senate authorizes committees, "including any subcommittee of any such committee," to hold hearings, subpoena witnesses, and require the production of "correspondence, books, papers, and documents," Senate Rule XXVI(1), while the House authorizes "a committee or subcommittee" to exercise similar authority, House Rule XI.2(m)(1). In turn, a committee's chairman generally may act on behalf of the committee, at least in the absence of a contrary vote of the majority of its members. *See* Letter for David S. Ferriero, Archivist of the United States, National Archives and Records Administration, from Chuck Grassley, Chairman, U.S. Senate Committee on the Judiciary at 2 (July 30, 2018); *see, e.g.*, House Rule XI.2(m)(3) (providing that the full committee determines the "rules" and "limitations" for a delegation to a chair). Although the procedures for these compulsory processes vary based on the issuing committee or subcommittee, they all derive their authority from a delegation by the relevant House as a whole. *See, e.g.*, *Response to Congressional Requests*, 10 Op. O.L.C. at 82 ("exercise of subpoena power must be authorized by the relevant House" (citing *Reed v. County Comm'rs*, 277 U.S. 376, 389 (1928), and *McGrain*, 273 U.S. at 158)); *Congressional Oversight Manual* at 24 ("Committees of Congress only have the power to inquire into matters within the scope of the authority delegated to them by their parent body.").

By contrast, individual members of Congress who are not serving as the chairman of a committee, including ranking minority members, "generally do not act on behalf of congressional committees." *Application of Privacy Act*, 25 Op. O.L.C. at 289; *see also id.* at 289–90 (concluding, that "the Privacy Act's congressional-disclosure exception does not generally apply to disclosures to ranking minority members," because ranking minority members "are not authorized to make committee requests, act as the official recipient of information for a committee, or otherwise act on behalf of a committee"). Under existing congressional rules, those members have not been delegated the authority to institute official committee investigations, hold hearings, or issue subpoenas. *See Congressional Oversight Manual* at 65. For example, the Rules of the House state that a subpoena generally "may be authorized and issued . . . only when authorized by the committee or subcommittee, a majority being present," except that the committee may delegate subpoena power to a chairman. House

Rule XI.2(m)(3)(A)(i); *see also Response to Congressional Requests*, 10 Op. O.L.C. at 82 ("The rules of each [House] committee flesh out somewhat the requirements for issuance of a subpoena, specifying in particular if, or under what circumstances, the chairman of the full committee may issue a subpoena without a vote of the committee."); Michael L. Koempel, Cong. Research Serv., R44247, *A Survey of House and Senate Committee Rules on Subpoenas* 4–10 (Jan. 29, 2018) (summarizing House rules). The Standing Rules of the Senate delegate to each committee responsibility to establish subpoena procedures, Senate Rule XXVI(2), and while some of those committees delegate subpoena authority to a chairman, none authorizes an individual member who is not a chairman to issue a subpoena unilaterally. *See A Survey of House and Senate Committee Rules on Subpoenas* at 11–16 (summarizing Senate rules).

Federal courts have recognized that "no Senator and no Representative, is free on . . . his own to conduct investigations" without congressional authorization. *Gojack v. United States*, 384 U.S. 702, 716 (1966); *see Exxon Corp. v. FTC*, 589 F.2d 582, 593 (D.C. Cir. 1978) ("[D]isclosure of information can only be compelled by authority of Congress, its committees or subcommittees, not solely by individual members; and only for investigations and congressional activities."); *Lee v. Kelley*, 99 F.R.D. 340, 342 n.2 (D.D.C. 1983) (denying Senator leave to intervene to request access to sealed materials on the grounds that the Senator "appears as an individual Senator, without Senate authorization, in what is undeniably an investigatory role"), *aff'd sub nom. S. Christian Leadership Conf. v. Kelley*, 747 F.2d 777 (D.C. Cir. 1984). As the Congressional Research Service has summarized, individual members of Congress not acting pursuant to delegated oversight authority are entitled only to "the *voluntary* cooperation of agency officials or private persons." *Congressional Oversight Manual* at 65 (emphasis added).

## II.

The distinction between Congress's constitutionally based oversight authority and other congressional requests for information informs the Executive Branch's obligations and practices when responding to such requests. When a committee, subcommittee, or chairman exercising delegated oversight authority asks for information from the Executive Branch, that request triggers the "implicit constitutional mandate to seek

optimal accommodation . . . of the needs of the conflicting branches." *United States v. Am. Tel. & Tel.* ("*AT&T*"), 567 F.2d 121, 127 (D.C. Cir. 1977); *see also id.* at 130–31 (describing the "[n]egotiation between the two branches" as "a dynamic process affirmatively furthering the constitutional scheme"); *Assertion of Executive Privilege in Response to a Congressional Subpoena*, 5 Op. O.L.C. 27, 31 (1981) ("The accommodation required . . . is an obligation of each branch to make a principled effort to acknowledge, and if possible to meet, the legitimate needs of the other branch."). Such requests are enforceable by the issuance of a subpoena and the potential for contempt-of-Congress proceedings. *See McGrain*, 273 U.S. at 174; 2 U.S.C. §§ 192, 194; *see also* Senate Rule XXVI(1); House Rule XI.2(m)(1).

Regardless of whether the chairman or committee has served a subpoena, the Executive Branch will work to accommodate the committee's legitimate oversight needs, because a request for information is itself a valid exercise of Congress's oversight authority. The Executive Branch need not, and rarely does, insist upon the service of a subpoena or other compulsory process. Upon receipt of any request made by a committee, the Executive Branch's longstanding policy has been to engage in the accommodation process by supplying the requested information "to the fullest extent consistent with the constitutional and statutory obligations of the Executive Branch." Memorandum for the Heads of Executive Departments and Agencies from Ronald Reagan, *Re: Procedures Governing Responses to Congressional Requests for Information* (Nov. 4, 1982).

In contrast with a committee request, a letter or inquiry from an individual member or members of Congress is not made "pursuant to Congress's constitutional authority to conduct oversight and investigations." *Congressional Oversight Manual* at 56. As a result, while the Executive Branch often will respond to and cooperate with such a request, the request differs from an oversight request and does not trigger the "implicit constitutional mandate to seek optimal accommodation" that a request from a committee or chairman exercising Congress's delegated oversight authority would trigger. *AT&T*, 567 F.2d at 127.

These distinctions between requests for information made by a chairman or committee and requests made by individual members of Congress do not mean that individual members have no need for information from Executive Branch officials, or that Executive Branch officials should

disregard their requests. "Senators" and "Representatives" compose Congress as an institution, U.S. Const. art. I, §§ 1–3, and each member of Congress "participates in the law-making process" and "has a voice and a vote in that process." *Murphy v. Dep't of the Army*, 613 F.2d 1151, 1157 (D.C. Cir. 1979). Individual members, even those who are not chairmen of committees that have been delegated the oversight authority of a House of Congress, thus may "request . . . information from the executive agencies" about Executive Branch programs or activities—whether for legislation, constituent service, committee activities, or other purposes arising from members' legislative "responsibilities" (such as Senators' role in providing advice and consent for presidential appointments). *Id.*

The Executive Branch has historically exercised discretion in determining whether and how to respond to requests for information from individual members of Congress. Individual members often have legitimate interests in seeking information from Executive Branch officials, and providing this information can aid individual members in carrying out their legislative responsibilities. When individual members are requesting information in their official capacity on their own behalf, and not acting on behalf of a body of Congress, an Executive Branch policy of providing good-faith responses to their requests exhibits a proper respect for members of a coordinate branch of the government. Departments and agencies, therefore, appropriately give due weight and sympathetic consideration to requests for information from individual members of Congress.\*

---

\* In response to a letter from Senator Grassley expressing concerns with *Oversight by Individual Members*, the White House Director of Legislative Affairs issued a policy statement regarding requests from individual members on July 20, 2017. That statement provides, consistent with our conclusion here, that

[t]he Administration's policy is to respect the rights of all individual Members, regardless of party affiliation, to request information about Executive Branch policies and programs. The Administration will use its best efforts to be as timely and responsive as possible in answering such requests consistent with the need to prioritize requests from congressional Committees, with applicable resource constraints, and with any legitimate confidentiality or other institutional interest of the Executive Branch. Moreover, this policy will also apply to other matters on which individual Members may have an interest, whether it be considering possible legislation, evaluating nominees for confirmation, or providing service to constituents.

Letter for Charles E. Grassley, Chairman, U.S. Senate Committee on the Judiciary, from Marc Short, Director of Legislative Affairs, The White House at 2 (July 20, 2017).

In doing so, the Executive Branch may—and often does—provide information to individual members that is more than what is required under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. FOIA generally requires only that a department or agency release certain records in its custody. It does not require the department or agency to explain existing policies or to create documents that do not already exist. *See Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 152 (1980) (FOIA "does not obligate agencies to create or retain documents; it only obligates them to provide access to those which it in fact has created and retained"). Yet the Executive Branch often responds to requests by members of Congress with correspondence that answers substantive questions, supplies a reasoned justification for existing policy, or explains why the Executive Branch's established confidentiality interests preclude it from providing requested information. Such discretionary responses also furnish the department or agency with an opportunity to correct misperceptions or inaccurate factual statements that may be the basis for a request. By the same token, departments and agencies often prioritize their responses to the members' requests in a manner that differs from ordinary FOIA requests submitted by members of the general public.

Although departments and agencies will generally respond to requests from individual members of Congress, we recognize that they may decline to provide information to individual members when doing so would, for example, be overly burdensome; would inhibit the Executive's responsibility to protect information that is privileged, confidential, or otherwise protected by law; or would interfere with the ability to respond in a timely manner to requests for information submitted pursuant to Congress's oversight authority.

Our treatment of requests for information from individual members of Congress is consistent with the D.C. Circuit's decision in *Murphy v. Department of the Army*. *Murphy* held that memoranda withheld from disclosure in response to a FOIA request did not lose their statutorily exempt character as a result of disclosure to an individual member of Congress. In reaching this holding, the court pointed to then-5 U.S.C. § 552(c), which provided that FOIA "is not authority to withhold information from Congress." 613 F.2d at 1155. The court reasoned that, "to the extent that Congress has reserved to itself in section 552(c) the right to receive information not available to the general public, and actually does receive such information pursuant to that section . . . , no waiver occurs of

the privileges and exemptions which are available to the executive branch under the FOIA with respect to the public at large." *Id.* at 1156. The court found "no basis in the statute or in public policy for distinguishing for FOIA purposes between a congressional committee and a single Member acting in an official capacity," on the grounds that "[a]ll Members have a constitutionally recognized status entitling them to share in general congressional powers and responsibilities, many of them requiring access to executive information." *Id.* at 1157.

*Murphy*'s holding—that, in light of section 552(c), disclosure of materials to an individual member of Congress does not waive the FOIA exemptions that are available for requests from the public—does not erode the legal distinction between requests for information made by a committee (pursuant to Congress's delegated oversight authority) and requests made by individual members of Congress. *Murphy* involved the statutory meaning of the word "Congress" "for FOIA [exemption] purposes," which the court read to include individual members of Congress. *Id.*; *see id.* at 1158 ("What is at issue is the construction to be given to [section 552(c)] which safeguards congressional access to executive information notwithstanding the FOIA exemptions and the relationship of that provision to the question of when confidentiality is waived or destroyed by disclosure to a third party."). To be sure, *Murphy* recognized the significant role that individual members play in congressional processes as providing support for reading "Congress" to include individual members. But the court's point was that FOIA was not designed to stymie the flow of information between Executive Branch agencies and individual members by subjecting those materials to a waiver of privilege. That holding is entirely consistent with the view that there is a distinction between a committee request, which is an exercise of Congress's delegated oversight authority, and a request made by an individual member.

This understanding of *Murphy* is supported by an opinion by Judge Wald concurring in part and dissenting in part in a D.C. Circuit decision issued a few months after *Murphy*. *See FTC v. Owens-Corning Fiberglas Corp.*, 626 F.2d 966, 975–79 (1980). There, Judge Wald (who formerly served as Assistant Attorney General for the Office of Legislative Affairs) emphasized that only a "formal" congressional request, such as a letter or subpoena from a committee, would qualify for an exception to a statutory prohibition on the disclosure of trade-secret information. Two pre-*Murphy* D.C. Circuit cases had held that the Federal Trade Commission's disclo-

sure of trade secret information to congressional committees was "not a public disclosure forbidden by" the Federal Trade Commission Act ("FTC Act"). *Id.* at 970 (majority opinion) (citing *Exxon*, 589 F.2d at 589, and *Ashland Oil, Inc. v. FTC*, 548 F.2d 977, 979 (D.C. Cir. 1976)). *Owens-Corning* also concerned disclosure in response to a "formal request" from a committee, and the majority opinion relied on those cases to support its conclusion that the disclosure at issue was permissible under the FTC Act. *See id.* at 970, 974. However, a passing reference in the opinion to the recently decided *Murphy*, *see id.* at 974 & n.16, elicited a strong dissent from Judge Wald:

> The majority opinion's footnote 16, suggesting that a single Congressman's request for confidential information protected by [the FTC Act], even though the request is unauthorized by any committee or subcommittee of Congress, may stand on the same footing as a duly authorized committee or subcommittee request, is especially troubling. . . .
>
> I cannot agree with the majority's citation of [*Murphy*] to support their position. . . .
>
> Duly authorized Congressional requests were judicially recognized as a narrow exception [under the FTC Act] in *Exxon*; therefore, it is doubly important to insure that these requests are authorized ones. The majority too casually dismisses *Exxon* in this regard. No Member of Congress, acting on his own, has yet been judicially declared to have access rights to subpoenaed trade secret material for his own individually-defined legislative purposes, no matter how legitimate his interest.
>
> To suggest that *Murphy* may expand *Exxon*'s limited access [for committees] to cover any Member acting individually is to seriously dilute the protections of [the FTC Act], and even to undermine the duly constituted authority and processes of Congress. The Legislative branch operates in the sensitive area of trade secret disclosure with its coordinate branch, the Executive, through the structure and delegated powers of Congressional committees and subcommittees. Only if the Executive and the courts honor that structure will the Legislature itself, as well as agencies, be able to assure subpoenaed parties that their trade secret material is not subject to indiscriminate

disclosure to any or all of the 535 Members of Congress with diverse political and legislative interests.

*Id.* at 978–79 (Wald, J., concurring in part and dissenting in part).

Our consideration of congressional access to Executive Branch privileged information raises many of the concerns addressed by Judge Wald in her consideration of congressional access to statutorily protected trade secret information. Her rationale for distinguishing between requests from committees and individual members applies as well in the context of Congress's constitutional oversight authority as it does in the context of congressional requests under the FTC Act. Extending *Murphy* outside its FOIA context to apply to individual-member requests for information protected by executive privilege would intrude upon a comparably "sensitive area" in which the Executive Branch has recognized that Congress operates "through the structure and delegated powers of Congressional committees and subcommittees." *Id.* at 979. Giving the same access rights to individual members would also "seriously dilute" the protections that the accommodation process provides for the Executive Branch's privileged information and "undermine the duly constituted authority and processes of Congress." *Id.* at 978–79. To say that the Executive Branch should provide respectful consideration to a request from a member of Congress is not to say that each and every member may be viewed as exercising the oversight responsibilities that the Constitution entrusts collectively to each House of Congress.

## III.

We recently confronted a similar issue in advising NARA about the rights of individual Senators who were seeking records under the PRA related to the nomination of then-Judge Kavanaugh to the Supreme Court. In July and August 2018, we informally advised NARA that only a congressional committee or its chairman has authority to request presidential records under the PRA, unless the committee specifically delegates that authority to another member.

The PRA restricts access to presidential records after they are accessioned to NARA at the end of a President's tenure in office. *See* 44 U.S.C. §§ 2203(f), 2204. The PRA includes various exceptions to its restrictions on access, one of which provides that

subject to any rights, defenses, or privileges which the United States or any agency or person may invoke, Presidential records shall be made available . . . to either House of Congress, or, to the extent of matter within its jurisdiction, to any committee or subcommittee thereof if such records contain information that is needed for the conduct of its business and that is not otherwise available.

*Id.* § 2205(2)(C). The congressional exception provides that, under appropriate circumstances, NARA may provide access to nonpublic presidential records in response to a request from either House of Congress or any committee or subcommittee thereof.

Consistent with *Application of Privacy Act*, 25 Op. O.L.C. 289, we advised NARA that no individual member of a congressional committee other than its chairman is authorized to speak for or otherwise represent the committee for purposes of the PRA's congressional exception, absent an express delegation of authority from the committee to that member. The relevant PRA language in section 2205(2)(C) is identical to the Privacy Act language in 5 U.S.C. § 552a(b)(9), which we considered in *Application of Privacy Act*. In that opinion, we concluded that this language "prohibits the disclosure of Privacy Act-protected information to [a] ranking minority member," absent an express authorization from the committee. 25 Op. O.L.C. at 289. We explained that "[e]xcept where the Senate or House exercises its investigative and oversight authority directly, . . . each House of Congress exercises its investigative and oversight authority through delegations of authority to its committees," which in turn often delegate that authority to chairmen. *Id.* In contrast, "[a]s a general matter, ranking minority members are not authorized to make committee requests, act as the official recipient of information for a committee, or otherwise act on behalf of a committee." *Id.*; *see supra* pp. 4–5. Accordingly, "although the congressional-disclosure exception to the Privacy Act disclosure prohibition is available for disclosures to either House of Congress or to a committee of Congress," we concluded that a "disclosure of Privacy Act information solely to a ranking minority member is not a disclosure to the committee" because "ranking minority members generally do not act on behalf of congressional committees." *Application of Privacy Act*, 25 Op. O.L.C. at 289–90. "[T]he congressional-disclosure exception is therefore unavailable." *Id.*

So, too, under the PRA, no individual member of a committee other than its chairman may act on behalf of a committee, absent a specific delegation of authority to that effect, and thus disclosure to the individual member does not qualify as disclosure to the committee under the statutory exception to restrictions on access. 44 U.S.C. § 2205(2)(C). Nothing in the PRA suggests that Congress intended those terms to function differently in the PRA than in the Privacy Act. On the contrary, Congress used the same language in both statutes, enacted only a few years apart, to establish a similar congressional exception to prohibitions on disclosure. These similarities are "strong indication[s] that the two statutes should be interpreted *pari passu*." *Northcross v. Bd. of Educ.*, 412 U.S. 427, 428 (1973) (per curiam); *see also Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) (plurality opinion) ("[W]hen Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes.").

This interpretation of section 2205(2)(C) is consistent with NARA's longstanding administration of the statute. *See Application of Privacy Act*, 25 Op. O.L.C. at 290 (noting that the conclusion that the Privacy Act prohibits disclosure to ranking minority members "follows the longstanding Executive Branch practice on this question"). NARA informed us that it has always understood the PRA to give authority to request records only to the chairman of a committee or the committee itself, and that NARA has relied on *Application of Privacy Act* in concluding that ranking minority members could not make requests under section 2205(2)(C). For example, NARA declined to process requests from the Ranking Members of the Senate Judiciary Committee in connection with the nomination of Eric Holder as Attorney General and again with respect to the nomination of Elena Kagan to the Supreme Court. NARA's position with respect to the Kavanaugh nomination therefore was consistent with prior Executive Branch practice regarding section 2205(2)(C).

## IV.

In reviewing requests from Congress, the Executive Branch's longstanding policy has been to engage in the established process for working to accommodate congressional requests for information only when those requests come from a committee, subcommittee, or chairman acting pur-

suant to oversight authority delegated from a House of Congress. Departments and agencies, however, may appropriately give due weight and sympathetic consideration to requests for information from individual members of Congress not delegated such authority.

STEVEN A. ENGEL
*Assistant Attorney General*
*Office of Legal Counsel*